**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

SILVER STATE CONSTRUCTION COMPANY, INC.

v.

No. ____________

THE UNITED STATES

**COMPLAINT**

1. Plaintiff Silver State Construction Company, Inc. ("Silver State") for its Complaint against Defendant alleges as follows:

**JURISDICTION**

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491. Plaintiff brings this action pursuant to the Contract Disputes Act ("CDA"), 41 U.S.C. § 601, *et seq.* This action is an appeal pursuant to the CDA of the contracting officer's final decisions rendered on September 10, 2004, January 24, 2005, April 4, 2005, and July 28, 2005, as well as claims on which the contracting officer has not rendered a final decision.

**THE PARTIES**

3. Plaintiff Silver State Construction Company, Inc. ("Silver State") is a corporation organized and existing under the laws of Colorado, and has its principal place of business in Shiprock, New Mexico.

4. Defendant is the United States of America acting by and through the Department of the Interior, Bureau of Indian Affairs ("Defendant").

## GENERAL ALLEGATIONS

5. Defendant awarded Silver State Contract No. CBN0002001 on January 18, 2001 ("Contract"). The amount of the Contract was $4,994,019.95.

6. The Contract called for Silver State to furnish all labor, materials, equipment and incidentals necessary to construct improvements to a 4.17 kilometer section of Indian Service 608 Highway and a 0.28 kilometer section of Indian Service 1011 Highway. These locations are situated in or near Tuba City, Arizona.

7. The scope of the improvements required by the Contract generally included earthwork, grading, drainage grading and materials, untreated aggregate base course, curb, gutter, sidewalk, placement of hot asphaltic concrete pavement, roadway marking, traffic signage, and finish grading.

## COUNT I
(Borrow Claim – Change)

8. The Contract required, among other things, Silver State to place borrow material on the project ("Unclassified Borrow"). The Contract contained material specifications for the Unclassified Borrow, as well as specifications for the testing and submittal requirements for the Unclassified Borrow material.

9. Defendant supplied and/or made available to Silver State the project plans and specifications.

10. Silver State relied on the accuracy of the information contained in the project plans and specifications when it bid on the project.

11. The Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects ("FP-96") was made part of the Contract through reference. FP-96 contained the following requirement regarding Unclassified Borrow: "*Furnish*

*granular material free from excess moisture, muck, frozen lumps, roots, sod, and other deleterious material conforming to the following: (a) maximum dimension 600 mm; (b) soil classification, AASHTO M 142: A-1, A-3, or A-2-4".*

12. Silver State submitted to Defendant test results for a material source it planned on using for Unclassified Borrow in accordance with the Contract requirements.

13. The submitted test results for the material source met the requirements specified by Section 704.06 of FP-96 of the Contract.

14. Defendant approved Silver State's submittal of the test results for the material source it planned on using for Unclassified Borrow.

15. Thereafter, Silver State began placing the Unclassified Borrow on the project.

16. Silver State encountered delays beyond its control, preventing it from continuing to use the original borrow source for the Unclassified Borrow.

17. When Silver State informed Defendant that Silver State would have to secure an alternate borrow source, Defendant verbally directed Silver State to provide "ph" and "resistivity" testing on alternate material sources.

18. The Contract did not require submission of ph level or resistivity testing for Unclassified Borrow material.

19. Silver State submitted test results for the alternate borrow material that satisfied the Contract requirements specified in Section 704.06 of FP-96 of the Contract.

20. The test results for the alternate borrow material did not satisfy, however, the new requirements for ph and resistivity levels, as verbally required by Defendant.

21. Defendant issued a letter formally denying Silver State's submittal for the alternate borrow source based on the results of the ph and resistivity tests.

22. Defendant's denial of the submittal misstated and misinterpreted the Contract, and resulted in a constructive change to the Contract.

23. The Contract did not require Silver State to use Unclassified Borrow material that met any ph or resistivity requirements.

24. Defendant's requirement that the Unclassified Borrow material meet ph and resistivity levels changed the Contract.

25. Silver State was not able to use the alternate borrow source due to Defendant's change to the Contract.

26. The change to the Contract resulted in Silver State incurring increased cost and time in the performance of its work.

27. Defendant's improper disapproval of Silver State's alternate borrow source represents a change to the specifications, as the disproval effectively required Silver State to provide Unclassified Borrow material that met soil corrosive requirements that were not part of the Contract.

28. Defendant's change directive resulted in significant delays and disruption to Silver State's planned work.

29. Defendant's rejection of the alternate Unclassified Borrow caused Silver State to have to suspend a portion of its work until it could secure borrow material that met the new ph and resistivity requirements. The total impact delay period resulting from Defendant directed change was 26 calendar days.

30. As a result of Defendant's change to the Contract, Silver State incurred additional direct costs of $90,595.92.

31. Defendant has refused to issue a contract modification for the costs and additional contract time resulting from the specification change, notwithstanding Silver State's request pursuant to FAR 52.243.4 (Changes).

32. On December 3, 2002, Silver State submitted to Defendant a Request for Equitable Adjustment ("REA").

33. On September 10, 2004, Defendant denied "both the REA of $90,595.92 and the associated request for an increase in contract performance time."

34. In its September 10, 2004 denial letter Defendant "allow[ed] payment of a claim for $324.91 for the extra testing caused by the government's rejection of the Unclassified Borrow sample on September 23 (and 25), 2002."

35. Silver State is entitled to an equitable adjustment in the amount of $90,595.92 to compensate it for its additional cost of performance.

**COUNT II**
(Borrow Claim – Defective Specification)

36. The allegations contained in paragraphs 1 through 35 are incorporated herein by reference.

37. Defendant attempted to justify its new requirement to meet ph and resistivity testing values by citing to a different section in the Contract.

38. Defendant's attempt to read provisions of one contract section into another contract section indicates a defective and deficient specification.

39. Silver State is entitled to an equitable adjustment in the amount of $90,595.92 to compensate it for its additional cost of performance.

**COUNT III**
(Flood Claim – Change)

40. The allegations contained in paragraphs 1 through 39 are incorporated herein by reference.

41. Section 107.06 of FP-96 of the Contract provides that *"the Government will only be responsible for losses, injuries, damages caused by declared enemies and terrorists of the Government and cataclysmic natural phenomenon such as tornados, earthquakes, major floods and officially declared natural disasters."*

42. Major flooding occurred on the project work site during September 2002.

43. On September 9, 2002, during a meeting in which problems resulting from heavy rains and flooding were discussed, Defendant referred Silver State to the second paragraph of Section 107.06 of FP-96 which makes it the contractor's responsibility to repair all losses and damages caused by weather.

44. On September 11, 2002, the Navajo Commission on Emergency Management declared a "State of Emergency due to the localized flooding, mud, debris, and erosional damage from the recent extended rains." The Commission's vote resulting in the Resolution was unanimous and was signed by the Navajo Nation President, who has legal authroity of the Navajo Nation Reservation.

45. The flooding in September 2002 caused Silver State to incur costs and delays in order to repair damage to the project caused by the flooding.

46. The damage to the project consisted of severe erosion to areas of the roadway, ditches, and rights-of-way, damages to silt fences, plugging of pipes with debris, damage to the H-pile and timber retaining walls, and other damages.

47. The damage caused by the flooding created issues of safety that Silver State needed to be rectified to protect the community.

48. On September 13, 2002, Silver State notified Defendant in writing that the floods had caused problems on the project. Silver State stated that it would keep accurate records of all activities undertaken to bring the project to the point prior to the rains and "will provide detailed costs associated with the floods and the impact it had on the project for review and payment." The letter also stated that Silver State may request a time extension based upon the delay caused by the floods.

49. In addressing the effects of the flooding, Silver State incurred costs to: repair areas damaged by the floods; provide additional material to fill areas eroded by the floods; re-redtop roads damaged by the floods; conduct additional survey work for areas damaged by the floods; and provide additional field management, office and overhead related to the floods.

50. On March 21, 2003, Silver State in writing requested reimbursement for the costs and delays it incurred in repairing damage to the project resulting from the major flooding. Silver State requested reimbursement of $188,212.71 and additional contract time.

51. On November 23, 2004, Silver State's Vice President certified its request for $188,212.71 and additional contract time as a claim pursuant to FAR 52.233.1.

52. Defendant denied Silver State's certified claim and has refused to reimburse Silver State for the costs and time it incurred in responding to the damage caused by the floods.

53. Silver State is entitled to an equitable adjustment in the amount of $188,212.71.

**COUNT IV**
(Flood Claim – Breach of Contract)

54. The allegations contained in paragraphs 1 through 53 are incorporated herein by reference.

55. Defendant's actions with respect to the floods breached the Contract.

**COUNT V**
(Winterization Claim -- Change)

56. The allegations contained in paragraphs 1 through 55 are incorporated herein by reference.

57. Item No. 20403 of the Contract's Unit Price Schedule required Silver State to place approximately 46,724 cubic meters of Unclassified Borrow Material. This line item was later modified by Defendant through the issuance of Contract Modification 1, dated August 28, 2002, replacing it with line item 20403a, which called for the placement of 28,887 cubic meters of Unclassified Borrow Material.

58. Item No. 30101 of the contract's Unit Price Schedule called for Silver State to place approximately 25,303 metric tons of Untreated Aggregate Base Course, Grading "D".

59. Section 204 ("Excavation and Embankment") of FP - 96 of the Contract, provided the following: *"Earthwork construction requiring compaction shall not be performed from November 1 through May 15, except with permission of the Contracting Officer".*

60. Section 301.04 of FP-96 ("Excavation and Embankment") states in part "*In no case shall any embankment lift material be placed upon frozen, muddy, or unstable natural ground.*"

61. Silver State was delayed by Defendant in its performance of the Contract.

62. Silver State submitted a request to Defendant on October 28, 2002, to extend the dates for earthwork activities, since weather conditions were still suitable for earthwork construction.

63. Although Defendant continued to send its representatives to the project to observe the work, Defendant did not respond in writing to Silver State's request of October 28, 2002.

64. Silver State continued to work on the project after November 1, 2002.

65. All parties agreed that work would continue and be evaluated on a day-to-day basis.

66. The Contractor Quality Control Manager (Western Technologies, Inc.) continued testing during the month of November and into December, 2002.

67. On December 4, 2002 Defendant's representatives visited Silver State construction activities at Highway N608. At that time, Silver State was building subgrade with unclassified borrow (Item No. 20403a) and hauling in aggregate base course (Item No. 30101). On that day, Defendant issued a Notice of Noncompliance, which concluded that the ground was frozen.

68. The December 4, 2002 Notice of Noncompliance was unjustified. The referenced notice was not supported by any testing procedure. Defendant ignored contractually acceptable test results.

69. Based upon their expertise and compaction test results, the Contractor Quality Control Manager concluded that the embankment was neither frozen nor unstable.

70. Despite the Contractor Quality Control Manager's conclusion, Defendant refused to rescind the December 4, 2002, Notice of Noncompliance.

71. By issuing the Notice of Noncompliance and thereafter refusing to rescind it, Defendant improperly directed Silver State's work and operations.

72. As a result of the Defendant's conclusion that the ground was frozen, thereby preventing further work, Silver State was forced to shut down its construction operations for the winter.

73. If the Notice of Noncompliance had been rescinded both Items 20401 and 20403a could have been completed during December 2002 instead of extending into 2003.

74. Defendant's direction constituted a constructive change.

75. Defendant's Notice of Noncompliance and refusal to rescind it forced Silver State to shut down construction operations on the project for the winter, and remobilize in the spring at additional cost.

76. If Silver State had been allowed to proceed, Items 20401 and 20403a could have been completed and covered by Item 30101 which would have protected Items 20401 and 20403a from the winter elements.

77. Silver State incurred $38,184.93 in costs attributable to Defendant's actions.

78. Silver State has submitted a claim to Defendant for $38,184.93, which Defendant has denied.

79. Silver State is entitled to an equitable adjustment in the amount of $38,184.93.

**COUNT VI**
(Winterization Claim – Breach of Contract)

80. The allegations contained in paragraphs 1 through 79 are incorporated herein by reference.

81. Defendant's acts and failures to act with respect to its December 4, 2002, Notice of Noncompliance breached the Contract.

**COUNT VII**
(Modifications - Change)

82. The allegations contained in paragraphs 1 through 81 are incorporated herein by reference.

83. Contract modifications on the project increased the Contract time by 145 calendar days.

84. The modifications did not include Silver State's costs for field management, field office or overhead.

85. The modifications did not contain contractor release language.

86. Silver State incurred $173,193.47 in costs associated with field management, field office and overhead costs resulting from the Contract modifications.

87. Silver State submitted a claim for these additional costs of $173,193.47, which Defendant denied in its entirety.

88. Silver State is entitled to an equitable adjustment in the amount of $173,193.47.

**COUNT VIII**
(Seeding Claim)

89. The allegations contained in paragraphs 1 through 88 are incorporated herein by reference.

90. The Contract (as modified by Modification #4) required Silver State to plant seeds over 7.90 hectares.

91. Silver State's seeding subcontractor ordered and mixed the project specific mix for the planned Contract quantity of 7.90 hectares.

92. The seed mix was prepared and blended specifically for the Contract.

93. The measured quantity of seeding on the project was 3.27 hectares.

94. The seeding under run for the project was therefore 4.63 hectares, which is a 58.6% under run.

95. FAR 52.211-18 ("Variation In Estimated Quantity") provides: *"If the quantity of a unit-priced item in this Contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15% above or below the estimated quantity, an equitable adjustment in the Contract shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115% or below 85% of the estimated quantity."*

96. Pursuant to FAR 52-211-18, Silver State is entitled to an equitable adjustment for the difference between its actual costs for the seeding and what Defendant has paid it based on seeding quantities, amounting to $12,193.89.

97. Silver State requested Defendant pay the referenced $12,193.89, which request constituted a claim.

98. The Defendant did not respond to Silver State's claim, which constitutes a deemed denial of the claim.

99. Silver State is entitled to an equitable adjustment in the amount of $12,193.89.

**COUNT IX**
(Excavation Claim)

100. The allegations contained in paragraphs 1 through 99 are incorporated herein by reference.

101. The Contract quantity for item 20401a (Roadway Excavation) was 24,033 cubic meters. The actual quantity was 15,471 cubic meters. This constitutes a reduction of 36%.

102. This significant reduction in quantities caused Silver State damages in the amount of $33,417.36.

103. Silver State submitted a claim to Defendant for the referenced $33,417.36, which Defendant denied in its entirety.

104. Silver State is entitled to an equitable adjustment in the amount of $33,417.36.

**COUNT X**
(Final Payment Disputed Items)

105. The allegations contained in paragraphs 1 through 104 are incorporated herein by reference.

106. Defendant has verbally agreed to final payment on the Contract of $317,969.00.

107. Defendant has refused to agree to final payment on six (6) cost items, amounting to $84,050.00.

108. Defendant has not explained its refusal to pay the six (6) cost items.

109. Silver State submitted a claim regarding the six (6) cost items on July 6, 2005, to which Defendant has not responded.

WHEREFORE, Silver State Construction Company, Inc. prays:

1. That the Court enter judgment for Silver State and against the United States for Count I and Count II in the amount of $90,595.02;

2. That the Court enter judgment for Silver State and against the United States for Count III and Count IV in the amount of $188,212.71;

3. That the Court enter judgment for Silver State and against the United States for Count V and Count VI in the amount of $38,184.93;

4. That the Court enter judgment for Silver State and against the United States for Count VII in the amount of $173,193.47;

5. That the Court enter judgment for Silver State and against the United States for Count VIII in the amount of $12,193.89;

6. That the Court enter judgment for Silver State and against the United States for Count IX in the amount of $33,417.36;

7. That the Court enter judgment for Silver State and against the United States for Count X in the amount of $84,050.00;

8. That the Court award Silver State interest pursuant to the Contract, the Prompt Payment Act, and the Contract Disputes Act;

9. That the Court award Silver State reasonable attorneys fees (including without limitation pursuant to the Equal Access to Justice Act), proposal preparation costs, and other costs; and

10. That the Court award Silver State such other and further relief as the Court deems appropriate.

Dated: September 8, 2005.

Respectfully submitted:

Daniel E. Evans
Godin & Baity, LLC
1050 17th Street, Suite 1610
Denver, CO 80265
Telephone: (303) 572-3100
Fax: (303) 572-3400

ATTORNEY FOR SILVER STATE
CONSTRUCTION COMPANY, INC.

Of Counsel:

Deann Snider Zenisek
Godin & Baity, LLC
1050 17th Street, Suite 1610
Denver, CO 80265
Telephone: (303) 572-3100
Fax: (303) 572-3400